## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION
## CIVIL ACTION NO. 3:15CV-00071-RGJ

**CHARLES FRANKLIN MICHAEL**                                    **PETITIONER**

**VS.**

**AARON SMITH,** *Warden*                                       **RESPONDENT**

### Findings of Fact, Conclusions of Law
### And Recommendation

Charles Franklin Michael ("Michael") is a Kentucky prisoner that pled guilty to sodomy in the first degree and sex abuse in the first degree in October of 2011. Michael has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 for relief from his conviction. (DN 1). Respondent Aaron Smith ("Warden") has responded (DN 17), and Michael has replied (DN 18). Most recently, Michael filed a supplemental memorandum to his petition through hired counsel. (DN 38).   The District Judge referred this matter to the undersigned United States Magistrate Judge under 28 U.S.§§ 636(b)(1)(A) and (B) for rulings on all non-dispositive motions; for appropriate hearings, if necessary, and for findings of fact and recommendations on any dispositive matter. (DN 22). This matter is ripe for review.

### Findings of Fact

In September of 2009, Charles Franklin Michael moved with wife (Joy), two daughters (Francis and Brittany), and step-daughter (Dorothy) to Bardstown, Kentucky.[1] *See Michael v.*

---

[1] "Dorothy" and other children's names mentioned in this opinion are pseudonyms employed by the Kentucky Supreme Court to protect the children's true identities.

*Commonwealth*, No. 2012-SC-000097-MR, 2013 WL 1188052, at *1-2 (Ky. Mar. 21, 2013). A little over a year later, Detective Barbara Roby received a report from the Kentucky Cabinet for Health and Family Services that Michael was possibly abusing Francis and Dorothy. *Id.* Shortly after this report, all three girls were removed from Joy's home and placed in foster care. *Id.*

### A. Michael's Interviews with Law Enforcement

Michael voluntarily appeared for an interview with Detective Roby and Social Worker Sandra Newton around 9:00 AM on November 1, 2010, at the Bardstown Police Department.[2] (DN 38-1, at p. 1). Detective Roby advised Michael that he was not under arrest and recited his *Miranda* warnings. Michael waived his *Miranda* rights orally and in writing and agreed to speak with Roby and Newton. (*Id.*). About nine minutes into the interview, Michael was asked about a previous social services case opened against him in Asheville, North Carolina. (*Id.* at p. 6). That case resulted from a report of Michael's inappropriate sexual contact with Dorothy. (*Id.*). Michael explained that after that report was filed he quit his job, moved out of the family home, and agreed to not have any contact with the children until the North Carolina case was closed. (*Id.*).

As the interview progressed, Detective Roby indicated several times that she felt Michael was lying to her about his contact with Francis and Dorothy. (*Id.* at pp. 7, 9, 11, 12, 13). Approximately thirty minutes into the interview, Detective Roby said:

> Now, sometimes we try to hide stuff because we're ashamed of what we've done, but there's help out there for you, but you're not going to get that help unless you admit to what you've done and you admit that you've got a problem, okay? You've got a problem touching your children in their vagina areas, we know that. But you sitting here and lying to us and not admitting to it is not helping you any. All it's doing is hurting you and we know what happened . . . You're not going to get help unless you admit you've got the problem and you do have the problem, and you know you do.

---

[2] This Court has reviewed both the audio recordings of Michael's interviews with law enforcement submitted by the Warden (DN 27; DN 31) and the written transcript of Michael's first interview provided by Michael's hired counsel (DN 38-1) in making these findings of facts.

(*Id.* at p. 15).

Despite Detective Roby's encouragement, Michael continued to insist that he was not lying. (*Id.* at p. 16). Eventually, at thirty-four minutes in, Michael admitted to the initial incident where he had sexual contact with Dorothy in North Carolina. (*Id.* at pp. 16-17). He stated that while rubbing Dorothy's back to help her sleep he rubbed back down over her legs and butt and between her legs and vagina area when she wasn't wearing underwear. (*Id.*). He then stated that this has "happened a few times" and later identified three such incidents. (*Id.* at pp. 17-18).

Detective Roby continued to accuse Michael of not being completely honest, and Michael maintained that he only touched Dorothy on those three occasions. (*Id.* at p. 19). Upon further questioning, however, Michael stated that he may have gotten an erection when he touched Dorothy and that his penis may have bumped up against her while he was rubbing her back. (*Id.* at pp. 20-21). Almost an hour into the interview, Detective Roby and Sandra Newton left the interview room to go over some information. (*Id.* at p. 27). After a ten-minute break, questioning resumed. Michael once again maintained that he never touched his biological daughters but had three episodes with his step-daughter, Dorothy. (*Id.*).

About an hour-and-a-half into the interview, Detective Roby made the first of four statements that Michael later identified as coercive to the trial court. After Michael stated that he came in to the interview to show he is not running from the case and wanted to work with law enforcement, Detective Roby stated: "As of right now, you are not allowed to be around any of the children."[3] (*Id.* at p. 41). Michael responded, "yeah," and asked how the children were doing

---

[3] There is a slight variation in Detective Roby's statement as transcribed by the Kentucky Supreme Court and by Michael's counsel's most recent transcript submission. The Kentucky Supreme Court transcribed Roby's statement as: "As of right now, you are not allowed to be around *any of the children*." *Michael*, 2013 WL 1188052, at *2. The transcript that Michael's counsel recently submitted states that Detective Roby said: "As of right now you're not allowed to be around *any other children*." (DN 38-1, at p. 41).

and whether they were happy. (*Id.*). Two minutes later, Detective Roby made a second allegedly coercive statement: "You're going to continue to not have any contact with your children just until you admit to everything, you're not having contact with your children." (*Id.* at p. 42). The record reflects that Michael did not specifically respond to this statement.

Several minutes later, Michael again asserted that he had admitted to everything he did. Sandra Newton then made the third allegedly coercive statement:

> You know, before you can see any of your kids you will have to complete a sexual assessment treatment program, and if you're not honest with me you'll never get to see them and I'll make sure of that. So until you can sit here and tell us what really happened, nobody here is going to get help – nobody – and especially those little girls and you won't get to see them.

(*Id.* at p. 43). About three minutes later, Michael stated that Dorothy might have kissed his penis. (*Id.* at p. 44). When Detective Roby asked for further details, Michael stated he would prefer to continue the interview in a more professional setting, like "a sexual abuse place." (*Id.*). Detective Roby then encouraged Michael to "do this now" and get it off his chest. (*Id.*). Michael then confirmed that during the first incident in North Carolina, Dorothy touched his penis with her hands and mouth. (*Id.*).

Detective Roby continued to press Michael to admit to everything he had done so that they could get him help. (*Id.* at p. 46). Michael continued to state that he told them everything that happened, but also stated that "sometimes [Dorothy] would touch [his penis]" when he was helping her go to sleep and that during the first incident his penis brushed up against her vagina. (p. 48). Shortly thereafter, Roby made the fourth allegedly coercive statement:

> You're going to continue the rest of your life without seeing your children, because you want to bottle this up and you're too embarrassed and you just want to throw your time away with your children for the rest of your life because you don't want to talk about it.

(*Id.* at p. 49).

4

Michael did not directly respond to this statement but a few minutes later asked: "[c]an you tell me what is going to happen?" (*Id.* at p. 50). Detective Roby responded that when Michael's case goes to the grand jury, she will have to tell them that Michael "cooperated a little bit, but . . . didn't cooperate completely." (*Id.*). When asked if he was sticking to his story, Michael indicated: "I've told you everything." (*Id.*). The interview concluded a few minutes later, around 11:00 AM. Michael left the police station but was arrested shortly thereafter because law enforcement believed he might flee the state.

He was then interviewed a second time from approximately 12:30 PM to 1:45 PM primarily by Detective Lynn Davis and by Detective Roby for part of the time. Michael was again read his rights, which he waived orally and in writing. Shortly into the second interview, Michael admitted that he hadn't wanted to incriminate himself "right off the bat" during the first interview. He then proceeded to make several seriously incriminating admissions involving his behavior toward Dorothy: "(1) he pressed his pinky finger against Dorothy's rectum, perhaps to the point of penetration; (2) he rubbed his penis against Dorothy's buttocks; (3) he touched her vagina with his penis; (4) he ejaculated on her twice; (5) his penis was briefly in her mouth on one occasion; and (6) his penis could have slipped into her rectum on two occasions." 2013 WL 1188052, at *2. Michael also provided a written confession following the second interview.

## B. Procedural History

Two days after these interviews, a Nelson County Grand Jury entered a multiple-count indictment against Michael, including charges of first-degree sodomy, incest, criminal abuse in the first degree, and sexual abuse in the first degree, among others. (DN 17-2, at pp. 107-110). Michael moved to suppress his statements to the police, arguing they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). (*Id.* at pp. 105-06). On October

6, 2011, the Nelson County Circuit Court conducted an evidentiary hearing on Michael's motion to suppress. Detective Roby and Michael testified at the hearing, and the Commonwealth played a tape recording of Michael's verbal statements to law enforcement during the interviews. (*Id.* at p. 93). Five days later, Michael filed a supplemental motion to suppress, identifying the four allegedly coercive statements from law enforcement that caused him to provide an involuntary confession. (*Id.* at pp. 102-03).

The Nelson Circuit Court denied Michael's Motion to Suppress. (*Id.* at p. 100). In doing so, the court acknowledged that the four identified statements from Detective Roby or Sandra Newton were "inappropriate" but that under the totality of the circumstances, Michael's statements were voluntary. (*Id.*). After this denial, Michael entered a guilty plea to one count each of sodomy in the first degree and sex abuse in the first degree. The Nelson Circuit Court sentenced Michael to fourteen years for the sodomy charge and six years for the sex abuse charge, to run consecutively for a total of twenty years. (*Id.* at pp. 89-90). Michael's guilty plea reserved the right to appeal the trial court's denial of his motion to suppress. (*Id.* at p. 90).

Michael timely filed an appeal to the Kentucky Supreme Court, arguing that his confession was involuntary and that he was coerced by law enforcement into making incriminating statements. (*Id.* at pp. 69-77). On March 21, 2013, the Kentucky Supreme Court affirmed Michael's judgment and sentence. (*Id.* at pp. 32-45). Michael sought a petition for rehearing (*Id.* at pp. 11-16), which was denied on August 29, 2013 (*Id.* at p. 1). Michael did not file a petition for writ of certiorari with the United States Supreme Court. On March 26, 2014, Michael filed a motion for post-conviction relief from his judgment and sentence under Kentucky Rule of Criminal Procedure 11.42. But Michael sought withdrawal of his RCr 11.42 motion on November 5, 2014, and the court entered the withdrawal five days later.

Michael has now filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 with this Court. (DN 1). The Warden has responded (DN 17), and Michael has replied (DN 18). At the Court's request, the Warden produced audio copies of Michael's recorded interviews with law enforcement from November 1, 2010. (DN 23; DN 27; DN 31). Michael then, with the assistance of hired counsel and the Court's permission, filed a supplemental memorandum to his petition, which includes a written transcript of Michael's first interview with law enforcement.[4] (DN 38; DN 38-1).

## **Standard of Review**

The federal habeas statute, as amended in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides relief from a state conviction if the petition satisfies one of the following conditions:

> The [state court's] adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court of the United States has carefully distinguished federal habeas review from review on direct appeal. As to § 2254(d)(1), when the state court articulates the correct legal rule in its review of a claim, a "federal habeas court may not issue the writ simply because that

---

[4] During a telephonic conference with the Court on May 30, 2019, counsel for the Warden indicated that although he had not had a chance to compare the transcript submitted by Petitioner's counsel, he had no reason to believe the transcript was inaccurate and indicated he did not intend to file any responsive memorandum. (DN 40).

court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000); *see also Tolliver v. Sheets*, 594 F.3d 900, 916 (6th Cir. 2010). Instead, the Court must ask "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409. The phrase "contrary to" means "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.* at 405 (citing Webster's Third New International Dictionary 495 (1976)). Thus, under the "contrary to" clause of § 2254(d)(1), the Court may grant the petition if (a) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; **or** (b) the state court decides a case differently than the Supreme Court "has on a set of materially indistinguishable facts." *Id.* at 405-06, 412-13.

As to § 2254(d)(2), a federal habeas court may not substitute its evaluation of the state evidentiary record for that of the state trial court unless the state determination is unreasonable. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). This subsection applies when a petitioner challenges the factual determinations made by the state court. *See Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001) (challenging the state court's determination that the evidence did not support an aiding and abetting suicide instruction); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) (challenge to state court's factual determination that Sheriff has not seen letter prior to Clark's trial).

## Conclusions of Law

Michael raises three issues in his § 2254 petition. His first two claims focus on the alleged involuntariness of his confessions. (DN 1, at pp. 5-11). His third claim challenges the quality of the audio transcripts from his interviews with law enforcement that the Kentucky Supreme Court relied on in denying his appeal. (*Id.* at pp. 12-13).

A. Grounds One and Two: The Voluntariness of Michael's Confession

Because Michael's first two claims both deal with the Kentucky Supreme Court's determination that his admissions during the November 1, 2010 interviews were voluntary and essentially rely on the same facts, these claims will be addressed together. His first claim asserts that the delay in time between law enforcement's coercive statements and his confessions should not negate the causality of the two. (DN 1, at p. 5). His second claim argues that law enforcement was coercive from the beginning of the first interview. (*Id.* at p. 8). After reviewing these arguments in Michael's Petition (DN 1), Reply (DN 18), and Supplemental Memorandum (DN 38), it appears Michael brings these claims under both § 2254(d)(1) and (d)(2).

i. §2254(d)(1)

The starting point for claims brought under § 2254(d)(1) is to identify the "clearly established Federal law, as determined by the Supreme Court of the United States," that governs the habeas petitioner's claims. *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013). Here, the Supreme Court's holdings in *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961) and *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) are at issue.[5]

---

[5] In his Supplemental Memorandum, Michael also alleges that his confession was obtained in violation of *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976), which prohibits prosecutorial comment on a defendant's exercise of his Fifth Amendment right to silence. (DN 38, at p. 10). Michael argues that his right to silence was violated by law enforcement's threats that they would report Michael's refusal to completely cooperate to the grand jury. (*Id.*). This is the first time Michael has ever raised a claim under *Doyle*. Because Michael did not fairly present his *Doyle* claim on direct appeal to the Supreme Court of Kentucky, he has procedurally defaulted this claim on federal habeas review. *See Riggins v. McMackin*, 935 F.3d 790, 793 (6th Cir. 1991) ("A state prisoner generally must give the state courts a fair opportunity to remedy any constitutional infirmity in the conviction before seeking relief in a federal court") (citing *Castille v. Peoples*, 489 U.S. 346, 349 (1989)). A petitioner's default may only be excused if he can establish cause and prejudice for the failure to raise his claim in the state courts or if he can demonstrate actual innocence. *Nesser v. Wolfe*, 370 F. App'x 665, 670 (6th Cir. 2010); *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L.Ed.2d 594 (1977)). Since Michael has made no effort to establish either cause and prejudice or his actual innocence, the Court declines to further address the merits of this claim and recommends relief be denied.

a. *Culombe*

Michael claims the Kentucky Supreme Court unreasonably applied or refused to apply

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). In that case, the Supreme Court outlined the

test for voluntariness of a confession:

> Is the confession the product of an essentially free and unconstrained choice by its
> maker? If it is, if he has willed to confess, it may be used against him. If it is not, if
> his will has been overborne and his capacity for self-determination critically
> impaired, the use of his confession offends due process. *Rogers v. Richmond*, 365
> U.S. 534. The line of distinction is that at which governing self-direction is lost and
> compulsion, of whatever nature or however infused, propels or helps to propel the
> confession.

367 U.S. at 602. This voluntariness determination is evaluated under "the totality of the relevant

circumstances of a particular situation." *Id.* at 607. These relevant circumstances may include the

duration and conditions of detention, the manifest attitude of the police toward the suspect, the

suspect's physical and mental state, and "the diverse pressures which sap or sustain [the suspect's]

powers of resistance and self-control." *Id.* at 602.

In *Culombe*, the Court considered that the defendant was illiterate; was held in police

custody for more than four days before confessing; was questioned solely to obtain a confession;

was confronted by his wife during the interrogation; was not read his constitutional rights; and was

denied an attorney after requesting one. *Id.* at 631-32. Based on those circumstances, the Court

found the defendant had made an unwilling admission of guilt and due process precluded the use

of such confession.

In Michael's case, the Kentucky Supreme Court determined that although certain

statements by Detective Roby and Sandra Newton from the first interview satisfied coercive state

action, under the totality of the circumstances Michael's incriminating statements were voluntary.

*Michael*, 2013 WL 1188052, at *6. Citing to *Culombe*, the Kentucky Supreme Court stated that

there was "absolutely no evidence in the record that [Michael's] 'will ha[d] been overborne and

10

his capacity for self-determination critically impaired.'" *Id.* (quoting *Culombe*, 367 U.S. at 602).

Michael now argues that he would not have confessed if law enforcement had not made coercive statements that "brutally condemned [him] as a liar" and broke down his will. (DN 18, at p. 13). Michael emphasizes that the delay between law enforcement's coercive statements and his confessions should not negate the causality of law enforcement's coercion. (DN 1, at p. 5). The Warden asserts that the Kentucky Supreme Court reasonably applied *Culombe* to Michael's case because it analyzed the totality of the circumstances in finding that Michael did not make incriminating statements before Detective Roby and Sandra Newton's coercive statements and that Michael did not fully confess until he was released, re-arrested, and *Mirandized* a second time. (DN 17, at pp. 15-16).

Again, for Michael to be entitled to relief, he must demonstrate that the Kentucky Supreme Court's application of *Culombe* was "objectively unreasonable," rather than merely erroneous or incorrect. *Williams*, 529 U.S. at 365. He has not done so. In analyzing law enforcement's behavior during Michael's interviews using the test for voluntariness in *Culombe*, the Kentucky Supreme Court found that law enforcement's four statements appealing to Michael's parental instincts were inappropriate because they were delivered in a threatening manner and were made for the sole purpose of coercing a confession. But the court explained that Roby and Newton's coercive statements did not induce Michael's confession:

> He did not make any incriminating statements in response to Roby and Newton's comments; indeed, he did not make *any* statements in response to the complained-of comments, despite their confession-inducing design, and remained silent following each one. Although [Michael] admitted to touching Dorothy's 'vagina area' (on three occasions) during the first interrogation, he did so before any of the coercive statements were uttered. The first interview ended shortly after Roby uttered the fourth and final at-issue comment; [Michael] did not make his other confessions (including those leading to the sodomy charge) until after he was released from the first interview, arrested at Joy's house, brought back to the police station, re-*Mirandized*, and questioned by Roby and Davis.

2013 WL 1188052, at *5.

The Kentucky Supreme Court further considered that Michael is highly intelligent; was not under the influence for twenty-four hours prior to the interviews; exhibited no psychological or emotional limitations during the questioning; and was given and waived his *Miranda* rights orally and in writing before both interviews. *Id.* at *5-6).

Despite finding that several of law enforcement's statements were coercive in appealing to Michael's instincts as a parent, the Kentucky Supreme Court was not objectively unreasonable in applying *Culombe* to determine that Michael did not make any incriminating statements in response to the coercive comments. *Culombe* does not identify a list of what considerations must be analyzed in the totality of the circumstances but instead reinforces that the legal voluntariness of a confession under the Due Process Clause is "drawn from the totality of the relevant circumstances of a particular situation" and requires a reviewing court to recount these circumstances in detail. 367 F.3d at 606. The Kentucky Supreme Court did just that. Likewise, neither *Culombe*, nor any other case cited by Michael, holds that a delay between a confession and law enforcement's coercive behavior creates or destroys causation.

Even though law enforcement's preying on Michael's parental instincts was coercive, under the deference required by AEDPA, and given the other factors supporting a finding that Michael's confession was voluntary, the undersigned cannot say that the Kentucky Supreme Court's analysis constituted an unreasonable application of federal law. The Court recommends relief be denied on this claim.

### b. *Lynumn*

Michael also argues that the Kentucky Supreme Court ruled contrary to the Supreme Court's decision in *Lynumn* by reaching an opposite result on materially indistinguishable facts. (DN 18, at p. 3). In *Lynumn*, the Supreme Court reiterated the test for voluntariness from *Culombe*

12

and noted that the question of voluntariness is "whether the defendant's will was overborne at the time he confessed." *Lynumn*, 372 U.S. at 534. The defendant in *Lynumn* confessed to unlawful possession and sale of marijuana after officers told her that she would be sent to jail, her state financial aid would be cut off, and her children would be taken away. 372 U.S. at 533 (1963). The threats were made while the defendant was "encircled in her apartment by three police officers" and another man, a twice-convicted felon, who had "purportedly 'set her up.'" *Id.*at 534. Because the defendant had no previous experience with criminal law and had "no reason not to believe that the police had ample power to carry out their threats[,]" the Court concluded that defendant's will was overborne and her confession was coerced. *Id.*

Michael states that like in *Lynumn*, he sat alone, without friends, advisors, or counsel to turn to, for nearly four hours facing law enforcement and a "hate-filled CPS worker," who would not rest until they had their confession. (*Id.* at p. 4). The similarities with *Lynumn* continue, Michael claims, because both were threatened with never seeing their children again and based on their lack of experience with criminal law, had no reason to believe the police officers would not carry out their threats. (*Id.*).

The Kentucky Supreme Court summarized the facts and holding of *Lynumn* and ultimately found that Michael's circumstances were distinguishable because although law enforcement's comments were coercive, Michael did not make any incriminating statements in response to the coercion. *Michael*, 2013 WL 1188052, at *3-5. This Court agrees that the circumstances in *Lynumn* and those from Michael's interrogation are not materially indistinguishable.

First, and most importantly, *Lynumn* predated *Miranda*. Unlike the defendant in *Lynumn*, Michael was read his *Miranda* rights before both interviews and voluntarily waived them, making it very difficult for him to demonstrate that his confession was nonetheless involuntary. *Loza v.*

13

*Mitchell*, 766 F.3d 466, 480 (6th Cir. 2014). By all accounts, Michael was cooperative and willing to speak with law enforcement. Michael was told during the first interview that he was not under arrest and was free to leave. He was even permitted to leave the police station after the first interview for short period before being arrested on suspicion of fleeing the state.

Second, other circumstances of Michael's interrogation distinguish it from the interrogations in *Lynumn* and *Culombe*, including Michael's age, education level, the relatively short length of his interrogation, and the environment in which he was interrogated. Additionally, Michael appeared voluntarily at the pre-arranged interview at the police station, and his children had already been removed from his wife's home and placed in foster care a week earlier.

While Michael, like the defendant in *Lynumn,* also had no friend or advisor present during the interviews, had no previous experience with the criminal justice system, and had his parental instincts preyed upon by law enforcement, the totality of the circumstances in Michael's case is not the same. And even though Michael's being alone with law enforcement during the interrogation and lack of experience with the criminal justice system may have made him more susceptible to coercion, these factors are not dispositive when considered among the whole. Michael's case was, therefore, not so indistinguishable from *Lynumn* that the Kentucky Supreme Court was required to arrive at the same result. The Court recommends relief be denied on this claim.

### ii. § 2254(d)(2)

Michael also seeks relief under § 2254(d)(2), arguing that the Kentucky Supreme Court unreasonably determined the facts: (1) by finding that he did not make any incriminating statements in response to law enforcement's allegedly coercive statements; (2) by ruling that his initial admissions prior to the four allegedly coercive statements were voluntary; (3) by not examining the entire interrogation process as a whole; and (4) by only finding one of law

14

enforcement's tactics (depriving him of his children) to be coercive. (DN 1, at pp. 6, 11; DN 38, at p. 11). To meet the "unreasonable determination of facts" standard in § 2254(d)(2), the state court's determination of facts must be more than incorrect, it must be objectively unreasonable.

### a. Did Michael make incriminating statements in response to law enforcement's coercion?

The Kentucky Supreme Court found that Michael did not make any incriminating statements in response to Roby and Newton's four coercive comments and that Michael remained silent following each one. *Michael*, 2013 WL 1188052, at *5. Michael argues this finding was "factual error" because "the presumption that response must immediately follow a statement in order to be considered an effect of that statement is erroneous, unprecedented, and irrational." (DN 1, at p. 6).

As an initial matter, Michael fails to cite any case law in support of this position. Additionally, after reviewing the audio recording and written transcript of Michael's interviews, the Court cannot say the Kentucky Supreme Court's finding was "objectively unreasonable." In response to law enforcement's first, second, and fourth coercive statements, Michael made no incriminating admissions. (*See* DN 38-1, at pp. 41-43, 49). After law enforcement's third comment, Michael again did not immediately incriminate himself. (*Id.* at p. 43). Law enforcement continued to probe Michael on whether he had ever put his penis in Dorothy's mouth. (*Id.*). Following about three minutes of this line of questioning, Michael admitted that Dorothy "might have kissed [his penis]" and that "the very first time [Dorothy] did touch [his] penis." (*Id.* at p. 44).

While Michael made several incriminating statements during both interviews with law enforcement, none of Michael's admissions were in direct response or appear to be the result of the four instances of "parental coercion" rendered by law enforcement. Even Michael's admissions

15

between the third and fourth coercive statements were not made immediately and logically resulted from a separate line of questioning. And Michael's claim that law enforcement's parental coercion took time to fully affect him and that he ultimately confessed during the second interview because the coercion accumulated is unsupported by his statements during the second interview. Namely, Michael's admission at the outset of the second interview that he hadn't wanted to incriminate himself "right off the bat" during the first interview supports that law enforcement's coercion did not "ultimately induce" Michael's confession. Michael's statement hints that he purposely waited to make full confession until he was arrested. Because the record reflects that Michael did not directly incriminate himself in response to the four coercive comments made by law enforcement, the Court cannot say that the Kentucky Supreme Court's finding was objectively unreasonable.

b. Were Michael's admissions prior to the
four coercive statements voluntary?

Michael next takes issue with the Kentucky Supreme Court's factual conclusion that "[a]lthough [Michael] admitted to touching Dorothy's vagina (on three occasions) during the first interrogation, he did so before any of the coercive statements were uttered. *Michael*, 2013 WL 1188052, at *5. Michael claims this finding was a "misconstruction of fact" because the interrogation was coercive from the outset, in that his children had been removed from Joy's house eleven days prior and he had no choice but to falsely confess to get his children back. (DN 1, at pp. 8-11). He states that he only made his first incriminating statement – that he inappropriately touched Dorothy – after Detective Roby stated: "You're not going to get help, unless you admit you've got the problem . . . ." (*Id.* at p. 10).

Not all interrogation tactics used by law enforcement render confessions involuntary. Reviewing courts have concluded that officers have some latitude in attempting to extract incriminating statements from suspects. Although Detective Roby and Social Worker Newton

repeatedly indicated from the beginning of the interview that they believed Michael was lying or not being fully honest, such behavior is not automatically considered coercive. Encouraging a suspect to tell the truth or advising a suspect of the legal ramifications of lying is not objectively coercive. *See, e.g., United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (no coercion where law enforcement agent told suspect he could get into serious trouble for providing false information and that his story was unbelievable); *United States v. Brinson*, 787 F.2d 593 (Table), 1986 WL 16715, at *2 (6th Cir. Mar. 4, 1986) (per curiam) ("[E]ncouraging suspect to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government."). It is additionally not coercive for officers "to discuss realistic penalties or results of cooperation or non-cooperation." *United States v. Daniel*, No. CRIM.A. 4:04-CR-017, 2006 WL 753082, at *2 (W.D. Ky. Mar. 22, 2006) (citation omitted).

Because Detective Roby's statement that Michael was "not going to get help unless [he] admitted to what [he'd] done" was not coercive, the Court disagrees that Michael's admissions that he touched Dorothy's vagina on several occasions were involuntary. The Kentucky Supreme Court's finding that such admissions were made before any coercive statements were uttered is, therefore, not objectively unreasonable.

c. Was the entire interrogation process examined as a whole
and were other tactics used by law enforcement coercive?

In his Supplemental Memorandum, Michael also alleges the state court was factually unreasonable in not examining the entire interrogation process as a whole and in finding only one of law enforcement's tactics (threatening to deprive Michael of his children) was coercive. (DN 38, at p. 11). Michael emphasizes that the Kentucky Supreme Court ignored "the host of other relentless improprieties that had the single purpose of obtaining a confession." (*Id.*). Much of his Supplemental Memorandum recounts additional ways that law enforcement allegedly acted

coercively by: (1) repeatedly calling Michael a liar; (2) making promises of leniency and freedom; (3) lying to Michael; (4) asking leading questions; (5) shaming Michael; (6) threatening to withhold Michael's children; and (7) manipulating Michael. (DN 38, at pp. 5-10).

First, the Kentucky Supreme Court's evaluation of the interrogation process was not objectively unreasonable. Even though the Kentucky Supreme Court focused on the four statements from law enforcement that appealed to Michael's parental instincts, the court also comprehensively summarized these interviews in its opinion. The Kentucky Supreme Court discussed the events leading up to the interviews; the date, location, and time of the interviews; the timing of Michael's various admissions; Michael's behavior during the interviews; and law enforcement's behavior during the interviews. This Court finds that while the Kentucky Supreme Court did not conduct a line-by-line review of Michael's audio interviews, the state court wholly examined the entire interrogation process. Michael's argument does not merit relief.

Similarly, the Kentucky Supreme Court did not "ignore" additional coercive behavior by law enforcement. The Kentucky Supreme Court noted that law enforcement told Michael several times "they wanted to offer him help but they could not do so until he admitted to everything he had done" and that they believed he had inappropriate contact with Dorothy and Francis. *Michael*, 2013 WL 1188052, at *1. Once again, encouraging a suspect to tell the truth, explaining the ramifications of lying, and discussing realistic penalties to a suspect are not objectively coercive tactics.

The same goes for Michael's newest allegations that the police shamed him, promised him leniency or freedom, asked leading questions, and manipulated him. The alleged leading questions and suspect-shaming directed at Michael appear to be basic interrogation techniques that do not rise to the level of coercion. The manipulation identified by Michael involved law enforcement

saying Michael should admit what he has done so that he can get help and so they would know what type of help to get for his children. This is not reprehensible manipulation constituting coercive conduct. It more closely resembles law enforcement again encouraging Michael to tell the truth. The alleged false promises of leniency and freedom included law enforcement asking Michael to admit the truth so that he could "walk out this door knowing that [he] had a chance to admit and get help for it." This behavior likewise resembles encouragement to tell the truth and is not objectively coercive.

Even though there were limited comments during Michael's interviews that constituted coercion, the Court does not find the Kentucky Supreme Court ignored or did not fully consider the entirety of the interrogation in ultimately finding Michael's confessions were voluntary. The Court finds that neither of these determinations are objectively unreasonable in light of the record, and Michael is not entitled to habeas relief under § 2254(d)(2).

## B. Ground Three: Corruption of Evidence

In his final ground for relief, Michael asserts that the transcripts used by the Kentucky Supreme Court on direct appeal were "corrupted past the point of serviceability" because nearly every page of the transcripts included omissions marked "(INAUDIBLE)." (DN 1, at p. 12). Michael also claims he directly remembers "many comments uttered by the interrogators" that were coercive in nature but are not included in the submitted transcripts. (*Id.*). For instance, Michael believes Detective Roby stated at one point, "admit to us what you've done and you'll take some classes, get probation, and then you'll get the kids back." (*Id.* at p. 13). Michael also recalls that Detective Roby got ready to leave once and stated, "I guess I have no choice but to tell them that you're not cooperating and that you won't be getting any help," to which Michael allegedly responded: "wait, tell me what you want me to say." (*Id.*). Because these "critical exchanges" are missing from the transcripts, Michael argues the legitimacy and legality of the

19

interrogation have been compromised. (*Id.*).

The Warden responds that Michael procedurally defaulted this issue by failing to bring the claim in state court on direct appeal or in collateral attack. (DN 17, at p. 16). The Warden further asserts that the trial court did not rely upon transcripts but thoroughly reviewed Michael's taped interviews. (*Id.* at pp. 17-18).

In reply, Michael acknowledges that his claim is defaulted, but seems to argue that because the issue of whether he is entitled to a fair ruling based on uncorrupted evidence is a "constitutional guarantee," his default should be excused. (DN 18, at p. 14). He reiterates that since the transcripts were made from the audio recordings, the audio itself is the source of the corruption on the transcripts. (*Id.* at p. 15).

The Warden is correct; by failing to raise this issue on direct appeal, Michael procedurally defaulted his claim. Procedural default bars federal habeas review of this claim unless Michael "demonstrates cause for the default and prejudice resulting therefrom, or that failing to review the claim would result in a fundamental miscarriage of justice." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). "Cause" must be something external to the petitioner, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), and "prejudice" must be so substantial that it undermines the integrity of the entire trial, *United States v. Frady*, 456 U.S. 152, 169-70 (1981). For assertions of "actual innocence," a petitioner must substantiate such claims with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

While Michael acknowledges his procedural default, he fails to establish cause and prejudice to excuse such default. Michael merely states that a ruling based on uncorrupted evidence is his "constitutional guarantee" and that his claim should proceed because "it has compromised

the very ruling of the Kentucky Supreme court on which this petition is based." (DN 18, at p. 14). These statements neither demonstrate an external reason for not raising the claims earlier nor set forth substantial prejudice that undermines the integrity of Michael's proceedings.

Michael similarly fails to meaningfully allege actual innocence to prove a fundamental miscarriage of justice. Although he alleges that Detective Roby made coercive statements that are omitted from the audio recordings and transcripts, the Court cannot presume a miscarriage of justice based on a petitioner's word alone. The Court agrees it is not ideal that the audio recordings and the written transcripts of Michael's interviews contain inaudible pauses that may have contained dialogue. However, nothing in the record demonstrates that the recordings or transcripts reviewed by the trial court or the Kentucky Supreme Court included additional statements that prove Michael's innocence.

Michael additionally had the opportunity to develop this claim when this Court ordered the Warden to produce audio copies of Michael's interviews. After the Warden produced copies of the recordings, Michael's counsel sought several extensions of time to secure "a clear, reliable recording of [Michael's police interview(s) of November 1, 2010." (DN 35). Michael also subpoenaed the Bardstown Police Department in March of 2019, seeking production of (1) "the Make, Model and Manual of the Recording System used on 11-1-10;" (2) the identity of the person, agency, or office that "Exported" the video disc obtained by Assistant Attorney General Moore, on or about February-March 2019 from the Commonwealth's Attorneys Office of Nelson County; and (3) the identity of who, how, and when the video disc was exported. (DN 34; DN 34-1). But Michael's subsequently-filed Supplemental Memorandum does not identify what the Bardstown Police Department produced in response to the subpoena and does not state whether any additional recordings were located. Because Michael did not further develop his allegations as to the quality

of the audio recordings, the Court again finds relief is not warranted.

For these reasons, the Court recommends that Michael's third ground for relief be considered procedurally defaulted and relief be denied.[6]

## C.  Certificate of Appealability

The final question is whether Michael is entitled to a Certificate of Appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(1)(B) on any or all of the claims raised in his petition. An appeal from the denial of a habeas corpus action may not proceed unless a judge issues a COA for the claim. 28 U.S.C. § 2253(c)(1); Rule 11 of the Federal Rules Governing Section 2254 Cases. When the Court rejects a claim on the merits, the petitioner must demonstrate that reasonable jurists would find the Court's assessment of the constitutional claim debatable or wrong for this Court to issue a COA. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The petitioner need not demonstrate that the claim will prevail on the merits; instead, the petitioner need only demonstrate that the issues he seeks to appeal are deserving of further proceedings or debatable among jurists of reason. *See Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).

For claims rejected on procedural grounds, *Slack* directs the Court to use a two-pronged test to determine whether a COA should issue. To satisfy the first prong, Michael must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Id.* To satisfy the second prong, Michael must show "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* The Court need not conduct the two-prong inquiry in the order identified or even address both parts if

---

[6] During the telephonic conference with the Court on May 30, 2019, Michael's counsel requested the Court grant him a hearing in this case to supplement his written submissions. (DN 40). The Court declined to grant a hearing at that time but decided to revisit Michael's request upon substantive review. (*Id.*). Now, after finding that none of Michael's arguments merit federal habeas relief, the Court will again decline to hold an in-person hearing on the matter.

Michael makes an insufficient showing on one part. *Id.* at 485.

### i. Claims 1 and 2

In his first and second grounds for relief, Michael alleges that the Kentucky Supreme Court's finding that his confession was voluntary was unreasonable under §2254(d)(1) and (d)(2). The Court recommends these claims be denied on the merits, noting that the Kentucky Supreme Court evaluated Michael's interrogation under the totality of the circumstances pursuant to *Culombe* and *Lynumn* and did not make any objectively unreasonable factual findings. After careful review, the Court does not find these claims for relief are deserving of further review on appeal or that reasonable jurists would find the adjudication debatable or wrong. The Court recommends a COA be denied as to Clams 1 and 2.

### ii. Claim 3

In his final ground for relief, the Court finds that a plain procedural bar is present because Michael had the opportunity to present this claim to the Kentucky Supreme Court but declined to do so. Because Michael fails to demonstrate cause and prejudice or actual innocence to excuse his default, the Court finds that jurists of reason would not consider this Court's procedural ruling debatable or wrong. The Court again recommends denying a COA on this claim.

## Recommendation

For the foregoing reasons, the Court **RECOMMENDS** the **DENIAL** of all claims in Michael's Petition for Writ of Habeas Corpus (DN 1) and Supplemental Memorandum (DN 38).

It is further **RECOMMENDED** that a Certificate of Appealability be **DENIED** as to all of Michael's claims.

Regina S. Edwards, Magistrate Judge

United States District Court

August 12, 2019

## NOTICE

Therefore, under the provisions of 28 U.S.C. Sections 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir.), *aff'd*, U.S. 140 (1984).

Copies:        Counsel of Record